UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

7/30/08

Michelle Poleo-Keefe,
   Plaintiff,

   v.

Michael Bergeron, individually and
in his official capacity as
Caledonia County Sheriff, and
County of Caledonia, Vermont,
   Defendants.

:
:
:
:
:
:
:
:
:
:
:

No. 2:06-cv-221

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
(Papers 6, 9, & 17)

Michelle Poleo-Keefe brings suit against Caledonia

County (the "County") and Caledonia County Sheriff Michael

Bergeron under 42 U.S.C. § 1983.  Poleo-Keefe worked as an

administrative assistant/dispatcher for the Caledonia County

Sheriff's Department (the "Department").  On April 5, 2006,

Sheriff Bergeron terminated Poleo-Keefe because of her

relationships with two members of the Hell's Angels

Motorcycle Club ("Hell's Angels").  Poleo-Keefe alleges that

the termination violated her constitutional rights to due

process and freedom of association. The case is before the

Court on summary judgment motions by Poleo-Keefe and Sheriff

Bergeron and a motion to dismiss by the County.

I. Background

For the purposes of the pending motions the following facts are undisputed.

Poleo-Keefe began working at the Department in August 2004 as an administrative assistant and dispatcher.  Her duties required access to confidential Department information.  As an administrative assistant she could access personal information for all Department employees, including home addresses.  As a dispatcher she could access numerous confidential databases including Department of Motor Vehicle records, criminal records, warrants, information on current investigations, and prisoner locations.  Through the dispatch system Poleo-Keefe also had access to the Department deputies' activities and destinations.

Poleo-Keefe is divorced and has two children.  Her ex-husband, Dana Keefe, is a current Hell's Angels member. Both she and her ex-husband have contact with their children.  Following her divorce, Poleo-Keefe became romantically involved with Steven Dodge.  Dodge is a former president of the Hell's Angels' Manchester, New Hampshire chapter.  He previously served prison time for a weapons

2

related felony.  Dodge claims he has not been a Hell's Angels member since 2002.  Dodge lived with Poleo-Keefe for some time but moved out when the relationship ended in early 2005.

On March 31, 2006, the Vermont State Police informed Sheriff Bergeron of the relationship of Dana Keefe and Steven Dodge to Poleo-Keefe and their involvement with the Hell's Angels.  Sheriff Bergeron also learned that Poleo-Keefe's address was listed on Dodge's driver's license and automobile registration.  Sheriff Bergeron spoke with Poleo-Keefe about the information he had received.  She confirmed Dana Keefe's membership in the Hell's Angels and that Dodge had used her address.

Sheriff Bergeron felt that Poleo-Keefe's association with Hell's Angels members created a security risk.  He feared the Hell's Angels could obtain confidential law enforcement information through Poleo-Keefe.  With the Hell's Angels reputation for criminal activity, Sheriff Bergeron felt that access to such information would endanger public safety.  He then conferred with two Caledonia County Assistant Judges about the situation.  They concluded that Poleo-Keefe could no longer have access to confidential

3

Department information.  Because Poleo-Keefe would not be able to perform her job without such access, Sheriff Bergeron asked her to resign on April 4, 2006.  Poleo-Keefe refused to resign, and Sheriff Bergeron terminated her on April 5, 2006.

Poleo-Keefe has brought this action against Sheriff Bergeron and the County for violating her constitutional rights by terminating her due to her personal relationships.

II. Discussion

Poleo-Keefe claims that her termination violated her constitutional rights to due process and freedom of association.  She asserts that due process entitled her to a hearing prior to her termination and that her termination unconstitutionally interfered with her freedom of association with Dana Keefe and Steven Dodge.

A. Motion to Dismiss

The County moves to dismiss Poleo-Keefe's claims based on sovereign immunity.

The Court may grant a motion to dismiss if after accepting as true all factual allegations set forth in the complaint and drawing all reasonable inferences in plaintiff's favor, the plaintiff is not entitled to relief

under the law.  In re Tamoxifen Citrate Antitrust Litig.,
429 F.3d 370, 384-85 (2nd Cir. 2005), amended by 466 F.3d
187, 200-01 (2nd Cir. 2006).  "To survive dismissal, the
plaintiff must provide the grounds upon which [her] claim
rests through factual allegations sufficient 'to raise a
right to relief above the speculative level.'"  ATSI
Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir.
2007) (quoting Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955,
1965 (2007)).

The County asserts that regardless of whether Poleo-
Keefe's rights were violated, it is entitled to sovereign
immunity from suit because Sheriff Bergeron is a state
official.

Sovereign immunity poses a bar to federal jurisdiction
over suits against nonconsenting States.  Alden v. Maine,
527 U.S. 706, 730 (1999).  Local governments, such as the
County, are not entitled to sovereign immunity unless they
are acting as an arm of the State.  N. Ins. Co. of N.Y. v.
Chatham County, Ga., 547 U.S. 189, 193-94 (2006).  Sovereign
immunity bars suit for retrospective relief arising from the
acts of a state official, but not acts of a local government
official.  Huminski v. Corsones, 396 F.3d 53, 70 (2d Cir.

2005). "Whether a defendant is a state or local official depends on whether the defendant represented a state or a local government entity when engaged in the events at issue." Id. Therefore, the Court must decide whether Sheriff Bergeron represented the State or the County when terminating Poleo-Keefe.

The authorization for county sheriff's departments is found in 24 V.S.A. § 290(a):

> A sheriff's department is established in each county. It shall consist of the elected sheriff in each county, and such deputy sheriffs and supporting staff as may be appointed by the sheriff. **Full-time employees of the sheriff's department, paid by the county, shall be county employees for all purposes but shall be eligible to join the state employees retirement system, provided the county shall pay the employer's share.** The sheriff's department shall be entitled to utilize all state services available to a town within the county.
> (emphasis added)

Poleo-Keefe is clearly defined in the statute as a County employee. Under § 290(a) Sheriff Bergeron has the authority to appoint his supporting staff of County employees. The County's personnel policy indicates that Sheriff Bergeron is the immediate supervisor of Department employees and the policy directs him to manage and evaluate his employees. (Paper 16-3). Therefore, Sheriff Bergeron had authority

6

over the County employees at the Department by statute and
by County personnel policy.  Only by acting as a County
official could Sheriff Bergeron have such authority over
County employees.  While Vermont sheriffs have been held to
be state actors in other cases, their roles as state actors
have been limited to law enforcement and security duties.
See, e.g., Huminski, 396 F.3d at 73; see also McMillian v.
Monroe County, 520 U.S. 781, 793 (1997) ("Alabama sheriffs,
when executing their *law enforcement* duties, represent the
State of Alabama, not their counties." (emphasis added)).
Sheriff Bergeron's supervisory duties here were different in
nature from his law enforcement duties.  He was not
performing the traditional state role of keeping the peace;
rather, he was acting as a employee supervisor.

The County cites Frank v. United States, 860 F. Supp.
1030 (D. Vt. 1994), for the proposition that sheriffs are
state actors.  Frank addressed the issue of whether a county
sheriff could sue the federal government to challenge part
of the Brady Bill and listed the ways in which sheriffs are
controlled by the state government.  Id. at 1034-35.  Frank
is distinguishable because it addressed a sheriff's role
when challenging a federal law, not his role when managing

7

his employees.

Therefore, Sheriff Bergeron acted as a County official and sovereign immunity does not apply.

B. Summary Judgment

Both Sheriff Bergeron and Poleo-Keefe have moved for summary judgment.  The Court will grant summary judgment if no genuine issue of material fact exists, and, based on undisputed facts, the moving party is entitled to judgment as a matter of law.  Salahuddin v. Goord, 467 F.3d 263, 272 (2d Cir. 2006)(citing D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)).  In deciding whether there is a genuine issue of material fact the Court must resolve all ambiguities and draw all inferences in the light most favorable to the nonmoving party.  Id. (citing Ford v. McGinnis, 352 F.3d 582, 587 (2d Cir. 2003)).

1. Responsibility for Termination

Sheriff Bergeron argues that because Poleo-Keefe was a County employee, only the County should be subject to any liability.  He asserts that because the County assistant judges authorized the termination, the County is solely responsible for her termination.  As discussed above, Sheriff Bergeron has some authority over Department

8

employees, even though they are employed by the County.  The
County personnel policy lists the Sheriff as supervisor to
all Department employees.  However, the policy does not make
clear who has final authority to terminate an employee and
what authorization is required.  Therefore, the Court cannot
allocate responsibility for Poleo-Keefe's termination at the
summary judgment phase.  The Court should deny Sheriff
Bergeron's motion for summary judgment on this basis.

   2. Due Process

   Poleo-Keefe claims she was denied due process of law
because she was terminated from her position without any
hearing.  Sheriff Bergeron counters that Poleo-Keefe was an
at-will employee and therefore had no due process right to a
hearing.

   Employees who cannot be terminated except for good cause
have a property interest in continued employment.  Cleveland
Bd. of Educ. v. Loudermill, 470 U.S. 532, 538-539 (1985).  A
state cannot deprive an employee of this interest without
due process.  Id.  Due process requires that employees with
a property interest in continued employment receive some
kind of hearing prior to termination.  Id. at 542.  Poleo-
Keefe received no pre-termination hearing; therefore the

only issue is whether she had a property interest in continued employment.

Under Vermont law, employees contracted for an indefinite period of time are considered at-will employees and therefore have no property interest in continued employment. Havill v. Woodstock Soapstone Co., 172 Vt. 625, 627, 783 A.2d 423, 427 (2001). However, provisions of a personnel manual inconsistent with the at-will relationship can demonstrate that an employee can only be terminated for good cause. Id. at 628, 783 A.2d at 428. "Policies that are definitive in form, communicated to employees, and evince an employer's intent to bind itself" create enforceable rights. Id.

Poleo-Keefe concedes that she had no written contract with the County or the Department, but asserts that the County personnel policy created a property interest in her continued employment. The policy reads in part:

> "A newly appointed employee shall serve a six (6) month probationary period in the position to which the employee is appointed. Any employee on probationary status may be dismissed at any time for failure to perform his/her duties properly or for any other good and sufficient cause."

Poleo-Keefe worked for more than six months and passed her probationary period, thus becoming a "permanent

10

employee" under the policy.   The policy details procedures for dealing with employees performing unsatisfactorily. However, Sheriff Bergeron admits that Poleo-Keefe was not terminated for poor performance.   The policy also details a grievance procedure for employees to appeal "disciplinary actions regarding work rule violations or poor job performance."

The County personnel policy unambiguously states that probationary employees cannot be terminated without "good cause".   Sheriff Bergeron argues that "good cause" is not referenced anywhere outside the section on probationary employees and therefore, because Poleo-Keefe was not a probationary employee, good cause was not required.

It is unreasonable to interpret the policy to say that "probationary employees" can only be terminated for good cause but "permanent employees" can be terminated without cause.   The only reasonable interpretation is that "good cause" extends to permanent employees even though it is not explicit in the policy.   The existence of a grievance procedure also supports the interpretation that good cause is required because there would be no need to review a termination if cause was not needed.   The policy bound the

11

County to terminate Poleo-Keefe only for good cause, and she therefore had a property interest in continued employment and was entitled to due process before termination.  Before being terminated as a security risk, Poleo-Keefe was entitled to a hearing on whether she actually posed such a risk.  Because Poleo-Keefe received no pre-termination hearing, her due process rights were violated.

## C. Freedom of Association

Poleo-Keefe also alleges that her First Amendment right to free association was violated.  Sheriff Bergeron counters that she was fired because of the security risk she posed, her termination was justified, and her rights were not violated.

### 1. Nature of Association

The Supreme Court has recognized two types of protected associational interests, intimate association and expressive association.  Roberts v. United States Jaycees, 468 U.S. 609, 617-19 (1984).  While membership in an organization like the Hell's Angels may be considered expressive association, Poleo-Keefe was personally not a member of the Hell's Angels and was not engaged in any expressive activity.  Therefore, the only issue is whether Poleo-Keefe

was entitled to protection of any intimate associations.

2. Protected Relations

Sheriff Bergeron first argues that Poleo-Keefe's relationships are not protected associations because they are not of an intimate nature because she is no longer married to her ex-husband, and she was never married to her ex-boyfriend.

The courts have consistently extended intimate association to those in serious relationships even when there is no marriage.  Beecham v. Henderson County, 422 F.3d 372, 275-76 (6th Cir. 2005); LaSota v. Town of Topsfield, 979 F. Supp. 45, 49-50 (D. Mass. 1997).  Relationships that possess "relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship" have been given the protection of freedom of association.  Roberts, 468 U.S. at 620.

Poleo-Keefe was living with Dodge while they were involved with each other.  Relationships such as theirs, which for some are the natural precursor or alternative to marriage, deserve just as much protection.  It would defeat the aim of protecting martial relations if protection was

13

denied to serious intimate relations that often lead to marriage.

Also, the protection of intimate association would be gravely weakened if the protection did not remain after an association had ended.  Intimate relationships would be infringed if they could be the source of retribution at a later time.  While Poleo-Keefe's relationships may have ended with both men prior to her termination, the protection did not end with the relationships.

Further, Poleo-Keefe's ex-husband still is in contact with her through the raising of their children.  They continue a familial relationship as parents of their children, which also deserves protection.

3. Standard of Review

Upon concluding that Poleo-Keefe had a right to intimate association, we must look to the level of protection granted to the right.  The standard for reviewing actions alleged to burden an intimate association is far from clear.  The Second Circuit has declined to find a specific level of review.  See Adler v. Pataki, 185 F.3d 35, 44 (2d Cir. 1999) ("We need not decide in this case whether in some circumstances the conduct, or even the identity, of a wife

14

might raise such serious concerns about her husband's suitability for public employment as to justify the husband's discharge"). In <u>Adler</u> the Second Circuit held that it was unconstitutional to fire an employee in retribution for a lawsuit the employee's spouse had filed against state officials. 185 F.3d at 43-45. The court stated that such a discharge was well beyond the line of what is permissible but declined to expand on where the line is located. <u>Id.</u> at 44. Courts that have declared a standard vary greatly in what that standard is. The standards have ranged from only prohibiting "direct and substantial burdens" on intimate relationships, <u>see</u> <u>Montgomery v. Stefaniak</u>, 410 F.3d 933, 937-38 (7th Cir. 2005); <u>Beecham v. Henderson County</u>, 422 F.3d 372, 376-77 (6th Cir. 2005); <u>Singleton v. Cecil</u>, 133 F.3d 631, 634-35 (8th Cir. 1998), to the balancing test set forth in <u>Pickering v. Board of Education</u>, 391 U.S. 563 (1968), <u>see</u> <u>Shahar v. Bowers</u>, 114 F.3d 1097, 1103 (11th Cir. 1997), to requiring that the government tailor its rules "in a reasonable manner to serve a substantial state interest," <u>see</u> <u>Reuter v. Skipper</u>, 832 F. Supp. 1420, 1423 (D. Or. 1993).

Further compounding the murkiness of the right, courts have applied the levels of review in very divergent manners. While faced with facts similar to this case, one court has found that a termination is valid even under strict scrutiny, McCabe v. Sharrett, 12 F.3d 1558, 1574 (11th Cir. 1994), while another court has held that a termination is unconstitutional even under rational basis review. Reuter, 832 F. Supp. at 1425.

Sheriff Bergeron suggests that the court should use the balancing test set forth in Pickering to review his decision. The Pickering test was originally used to review employee free speech issues but has been expanded to review expressive association issues. Melzer v. Bd. of Educ., 336 F.3d 185, 192-96 (2d Cir. 2003). However, the Pickering test has rarely been applied when analyzing intimate association claims. The Pickering test does not logically fit with intimate association. The first factor involved in the test is the public concern of the employees speech or association. Melzer, 336 F.3d at 196. Intimate associations are by their very nature not public. See Montgomery v. Stefaniak, 410 F.3d 933, 937-38 (7th Cir. 2005) ("The Connick/Pickering test's requirement that the

16

plaintiff's association relate to a matter of public concern
is inapplicable to a claim based solely on intimate
association because a plaintiff's right of intimate
association does not depend on her also exercising her
separate and distinct right to engage in expressive
activity.")  Therefore, the Court will not apply the
Pickering balancing test.

Poleo-Keefe suggests that no balancing need be done and
any adverse action based on an intimate relationship is
invalid.  Caselaw does not support this contention.  When
the government's interests have been strong enough, the
courts have repeatedly found burdens on intimate
associations to be constitutional.  See e.g. Stefaniak, 410
F.3d at 937-38 (upholding the termination of a probation
officer for purchasing a car from a probationer's employer
because of the government's interest in preventing
prisoner/correctional employee fraternization and avoiding
the appearance of impropriety); Beecham, 422 F.3d at 378
(upholding a termination based on intra-office romantic
relationship because of the government's interest in
avoiding disruption in the workplace); Shaher, 114 F.3d at
1106-10 (upholding the withdrawal of an employment offer

based on an applicants same-sex union because of the government's interest in avoiding disruption and controversy). See also Montgomery v. Carr, 101 F.3d 1117, 1126 (6th Cir. 1996) (acknowledging that the government's interest in avoiding nepotism has consistently been held to outweigh the right to intimate association).

With so much inconsistent precedent, the Court looks to the common elements in the reasoning applied to intimate association cases. The central issue is whether the government decision based on the existence of an intimate relationship was objectively reasonable. The Supreme Court in Zablocki v. Redhail, stated that "reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed." 434 U.S. 374, 386 (1978).[1]   The Second Circuit in Adler also required reasonableness when it held that terminations based on intimate relations were invalid if the relations "could not reasonably be found to justify his discharge." Adler, 185 F.3d at 44.  See also Shahar, 114 F.3d at 1103 (giving deference to the government's "reasonable

---

[1] While Zablocki addressed the right to marry, courts dealing with intimate association issues have repeatedly relied on Zablocki.  See Adler, 185 F.3d at 42-43 (discussing courts which address intimate association in the same manner as the right to marry).

18

assessment" that an employee's intimate relation would cause disruption.); <u>Kelly v. City of Meriden</u>, 120 F. Supp. 2d 191, 197 (D. Conn. 2000) (stating that an employee's right to intimate association "must yield to the interests of the City of Meriden if the city has articulated a *reasonable basis* for her discharge." (emphasis added)).  Therefore, the issue before the Court is whether Sheriff Bergeron's decision to terminate Poleo-Keefe based on her intimate relations was objectively reasonable.

4.   Reasonableness

There is a genuine dispute as to whether the decision to terminate Poleo-Keefe based on her relationships was objectively reasonable.  Sheriff Bergeron argues that the decision was reasonable because:  Poleo-Keefe had access to sensitive and confidential information that, if disclosed, could endanger officer safety or hinder law enforcement; she associated with current and former members of the Hell's Angels; the Hell's Angels are a group well known for violence, criminal activity, and intimidation; and the relationships had potential to disrupt the effective functioning of the department.  However, certain facts could support a finding that it was not objectively reasonable to

19

terminate Poleo-Keefe because of her relationships.   Dodge was no longer in the Hell's Angels and there was no evidence that either man was involved in criminal activity while involved with her.   She had been divorced from Dana Keefe for sometime before working at the Department and current contact between them seems to focus around their children. Further, Poleo-Keefe worked for the Department for a year and a half without incident and during part of that time she was living with Dodge.   When she was terminated, she did not live with either man.   There are facts to support both sides, making the reasonableness of Poleo-Keefe's termination unclear.

Sheriff Bergeron attempts to analogize this case to Ortiz v. Los Angeles Police Relief Ass'n, in which a California court upheld a termination based on an employee's engagement to a prison inmate.   120 Cal. Rptr. 2d 670 (Cal. Ct. App. 2002).   While Poleo-Keefe had access to confidential police information, just like the employee in Ortiz, there are important distinguishing factors.   Id. at 673.   The employee in Ortiz was engaged to a person currently serving time for a felony conviction, while Poleo-Keefe was not involved with either man while they were

incarcerated.  Id.  Further, Poleo-Keefe was not romantically involved with either man at the time of her termination, while the employee in Ortiz was in an on-going relationship with an inmate and she was given the opportunity to end the relationship and save her job.  Id. at 674.  Because, unlike in Ortiz, Poleo-Keefe's romantic relationships were not with incarcerated felons and were not on-going, the cases are distinguishable.

The reasonableness of Poleo-Keefe's termination is genuinely disputed and is not an issue appropriately decided in summary judgment.

D. Failure to Exhaust

Sheriff Bergeron submits that Poleo-Keefe failed to exhaust her administrative remedies by not following the grievance procedure set forth in the personnel policy and is therefore barred from bringing suit.

Plaintiffs asserting a claim under § 1983 need not exhaust their administrative remedies before bringing suit. Patsy v. Bd. of Regents of Fla., 457 U.S. 496, 500-01 (1982)("this Court has stated categorically that exhaustion is not a prerequisite to an action under § 1983").  Failure to take advantage of a grievance procedure does not act as a

waiver of full due process.  <u>Ciambriello v. County of
Nassau</u>, 292 F.3d 307, 323 (2d Cir. 2002).  Post-deprivation
grievance procedures are constitutionally inadequate.  <u>Id.</u>
Therefore, failure to use the grievance procedure does not
limit Poleo-Keefe's claim.

  E. Qualified Immunity

   Sheriff Bergeron argues that even if he is found to have
violated Poleo-Keefe's rights, he is immune from suit
because of qualified immunity.

   Once a constitutional violation has been established,
officials can still be protected from liability for civil
damages through qualified immunity.  <u>Harlow v. Fitzgerald</u>,
457 U.S. 800, 815-19 (1982).  If an official's conduct does
not violate clearly established statutory or constitutional
rights of which a reasonable person would have known, they
are entitled to qualified immunity.  <u>Id.</u>  "A right is
'clearly established' if '[t]he contours of the right ...
[are] sufficiently clear that a reasonable official would
understand that what he is doing violates that right.'"
<u>Gilles v. Repicky</u>, 511 F.3d 239, 243 (2d Cir. 2007) (citing
<u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)).  The Court
must determine whether it would be clear to a reasonable

officer that his conduct was unlawful in the situation he confronted.  Id. at 243-44.

1. Due Process

The rule that employees that can only be removed for good cause are entitled to a hearing before termination is well established.  See Loudermill, 470 U.S. at 542. However, the Court must determine whether it would be clear to a reasonable person that Poleo-Keefe could only be terminated for good cause.  As discussed above the only reasonable interpretation of the County personnel policy is that Poleo-Keefe could only be terminated for good cause. Therefore, it would have been clear to a reasonable person that terminating Poleo-Keefe without a hearing violated her due process rights and Sheriff Bergeron is not entitled to qualified immunity on this issue.

2. Freedom of Association

As discussed above the boundaries of right to freedom of intimate association are largely unsettled and the Second Circuit has declined to articulate the level of review due to actions that infringe upon it.  The contours of the right to intimate association are not sufficiently clear to enable a reasonable official to understand what actions would

violate the right.  Therefore, Sheriff Bergeron is entitled to qualified immunity on this claim.

  F.  State Constitutional Claims

  Nothing leads the Court to believe that the Vermont Constitution offers a differing level of protection for the issues presented here and therefore they need not be addressed separately.

III. Conclusion

  For the reasons stated above I recommend that the Court GRANT Poleo-Keefe's motion for summary judgment on the procedural due process claims and DENY it on the freedom of association claims. I recommend that the Court DENY Sheriff Bergeron's motion for summary judgment on the procedural due process claims and GRANT it on the freedom of association claims.  I recommend the Court DENY the County's motion to dismiss.

  Dated at Burlington, in the District of Vermont, this 29th day of July, 2008.


                        /s/ Jerome J. Niedermeier
                        Jerome J. Niedermeier
                        United States Magistrate Judge

Any party may object to this Report and Recommendation within 10 days after service by filing with the clerk of the court and serving on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.   Failure to file objections within the specified time waives the right to appeal the District Court's order. See Local Rules 72.1, 72.3, 73.1; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a) and 6(e).